JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 8444

------------------------------------------------------------X

FREEPORT MARINE SA,

                    Plaintiff,

    - against -

VERTICAL UK LLP,

                    Defendant.

07 Civ. _____ . _

ECF CASE

------------------------------------------------------------X

### VERIFIED COMPLAINT

    Plaintiff, FREEPORT MARINE SA (hereinafter "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, VERTICAL UK LLP, (hereinafter "Defendant") alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

    2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Panama.

    3.    Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity organized and existing under the laws of United Kingdom.

    4.    At all material times, Plaintiff was the Owner of the motor vessel "LIQUID CRYSTAL" (hereinafter the "Vessel").

    5.    By a charter party dated May 7, 2006, Plaintiff chartered the Vessel to Defendant for a voyage from Santos to Cartagena, Columbia and Chaguaramas, Trinidad.



6.    During the course of the charter, disputes arose between the part. s regarding Defendant's failure to pay freight and/or demurrage due and owing under the charter party contract. *See description of claim in Arbitration Award annexed hereto as Exhi! it "1."*

7.    The charter party provides "this charter shall be governed by and construed in accordance with the law of the place as agreed in the fixture re-cap. If no express agreement is made, however, English Law and arbitration in London shall apply."

8.    Despite due demand, Defendant failed and/or refused to pay the sums due and owing to Plaintiff.

9.    Thus, pursuant to the charter party, Plaintiff commenced arbitration proceedings in London against Defendant on its claims.

10.    On August 1, 2007, an Award was issued in Plaintiff's favor and against the Defendant. *See Arbitration Award annexed hereto as Exhibit "1."*

11.    The Award found that Plaintiff succeeded on its claim, and directed Defendant to pay Plaintiff the principal sum of $86,023.72, together with interest thereon, at the rate of 7.5%, compounded quarterly from August 15, 2006 until the date of payment.

12.    The Arbitration Panel reserved their jurisdiction to issue a further Award of costs.

13.    Plaintiff estimates its recoverable costs to be approximately £30,000.00 ($61,110.17).

14.    Plaintiff is preparing to request the Panel to issue an Award of Costs in its favor and against the Defendant.

15.    Thus, Plaintiff also requests security for the ultimate Award of Costs to be issued by the Panel.

16.    As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s) and/or any Judgments issued thereon:

2

| | | |
|---|---|---|
| A. | Principal claim: | $86,023.72 |
| B. | Interest on principal claim:<br>7.5% interest, compounded quarterly from<br>August 15, 2006 until estimated date<br>of recovery (August 15, 2009) | $21,503.42 |
| C. | Estimated recoverable attorneys' fees and<br>costs: | $61,110.77 |
| D. | Estimated interest on recoverable attorneys<br>fees and costs:<br>7.5% interest, compounded quarterly from date of<br>Award (August 1, 2007) until estimated date<br>of recovery (August 15, 2009) | $10,008.01 |

**Total**                                                                  **$178,645.32**

17.    The Defendant cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of one or more garnishees which are believed to be due and owing to the

Defendant.

18.    The Plaintiff seeks an order from this court directing the Clerk of Court to

issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States

Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by

the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and

to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear

and answer under oath all and singular the matters alleged in the Verified Complaint;

B.      That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.      That pursuant to 9 U.S.C. §§ 201. *et seq.* this Court recognize and confirm any judgment rendered on the claims had herein as a Judgment of this Court;

D.      That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount **$178,645.32** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

E.      That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court

F.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

G.      That this Court award Plaintiff its attorney's fees and costs of this action; and

H.      That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

4

[2]

Dated: September 28, 2007
       New York, NY

                    The Plaintiff,
                    FREEPORT MARINE SA


               By: _Nancy_____
                    Nancy R. Peterson
                    Patrick F. Lennon
                    LENNON, MURPHY & LENNON, LLC
                    420 Lexington Ave., Suite 300
                    New York, NY 10170
                    (212) 490-6050 – phone
                    (212) 490-6070 – fax
                    mrp@lenmur.com
                    pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    New York
County of New York  )

1.    My name is Nancy R. Peterson.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        September 28, 2007
              New York, NY

                                        _Nancy_
                                        Nancy R. Peterson

6

## EXHIBIT "1"

7.    Neither party requested an oral hearing nor did we consider one to be
necessary. We have therefore determined the issues on the basis of the
documents and written submissions alone. A Reasoned Award was
requested. Our Reasons, which form part of this Final Award, are attached
hereto.

NOW WE the said **BRIAN WILLIAMSON and CHRISTOPHER J W MOSS** having
carefully considered the documents and evidence adduced and the parties'
submissions and given due weight thereto and having discussed the matter with one
another and found ourselves in agreement **DO HEREBY MAKE, ISSUE AND
PUBLISH THIS OUR FINAL ARBITRATION AWARD** on the matters referred to us
as follows:-

**WE FIND AND HOLD THAT** the Owners' Claim succeeds to the extent of US
$86,023.72 (eighty six thousand and twenty three dollars and 72 cents).

**WE THEREFORE AWARD AND ADJUDGE** that the Charterers shall forthwith pay
to the Owners the sum of US $86,023.72 (eighty six thousand and twenty three
United States dollars and 72 cents) together with interest on this sum at the rate of
7.5% per annum, compounded with three monthly rests from 15 August 2006 to the
date of payment.

**WE DECLARE THAT** this Award is final as to the matters hereby determined, but we
expressly reserve to ourselves jurisdiction to make a further Award or Awards, as
may be appropriate to determine all matters referred to us but not decided herein
including    the    matter    of    costs,    which    we    have    reserved.

3

---

## REASONS

---

1. The dispute in this arbitration is for a balance of freight in the amount of US $127,881.24, net of commission, arising from a demurrage claim. The principle issues in dispute are: the validity of the Notice of Readiness (NOR) at the load port; the commencement of laytime and the standard of cleanliness of the tanks and cargo systems prior to loading.

### Background

2. The vessel was fixed on an amended Asbatankov form charterparty for a voyage from Santos to Cartagena, Columbia and Chaguaramas, Trinidad.

3. The vessel arrived at Santos at 0842 on Friday 21st July 2006, whereupon the Master tendered NOR to load. The NOR was initially tended by email but subsequently delivered in hard copy. The copy in evidence is endorsed "SHIPPERS/TERMINAL REFUSED TO ACCEPT/SIGN NOTICE OF READINESS."

4. Free pratique was granted at 1205. According to the claim submissions, the designated loading berth was occupied on arrival and the vessel remained at anchor during the ensuing weekend.

6. At 1535 on Monday 24th July, the ICB surveyors boarded to carry out tank inspection. This was conducted between 1550 and 1845 during which period tanks were inspected, a wall wash performed and samples taken. The surveyors left at 1855.

6.    At 1220 on the 25th, when the results of the laboratory analysis ware known, the vessel was advised that tanks 1C, 2S, 3P, 3S, 4P, 4S, 5P, 5S, 5S, 7P and 7S were reproved by the surveyors. No reasons were given for the rejection and no details of any laboratory analyses have been submitted in evidence.

7.    Further tank cleaning was carried out between 1220 on the 25th and 1100 on the 26th. The surveyors boarded again at 1520 on the 26th and inspected the remaining tanks between 1535 and 1615. They left again at 1745 and at 0050 on the 27th confirmed that tanks 1C, 2S, 3P, 4P, 4S, 5P, 5S, 5S, 7P and 7S were reproved.

8.    Further tank cleaning was carried out between 0050 on the 27th and 1200 on the 28th. The surveyors boarded again at 1550 and re-inspected these tanks between 1625 and 1700. They left again at 1740, and at 2000 confirmed that tank 4S alone was reproved.

9.    Further cleaning of 4S was carried out between 2000 on the 28th and 0900 on the 29th. As a consequence of bad sea conditions the surveyors did not re-inspect the remaining tank at the anchorage.

10.   At 0730 on the 1st August the Pilot boarded for berthing and the vessel was all fast at the Alamoa Terminal Pier 3 at 0905. Between 0940 and 1:05 a wall wash of 4S tank was carried out as well as a visual inspection of all the other tanks. The Statement of Facts (SOF) records that at 0950/1000 Tyndall and Chlorides test/Passed. At 1130, 4S tank was formally passed   Cargo operations began at 1115 by commencement of filling the shore line. Loading was completed at 1020 on the 2nd of August and hoses were disconnected at 1100. Cargo temperatures, measurements and calculations were concluded at 1300 and the Pilot boarded at 1430. The vessel left the berth at 1450 and sailed from the port at 1620.

11.   According to ship's figures the Vessel loaded 5,443.007 tonnes of neutral Ethyl Alcohol. According to shore figures the quantity was 5,461.151 tonnes. No issue arises as a consequence of this difference.

6

12. The Vessel arrived at Cartagena, Columbia on 17 August 2006 and tendered NOR at 0736. The Pilot boarded at 0810 and the vessel was all fast alongside Algranel Terminal by 0942. Cargo sampling was carried out between 1030 and 1205 and measurements were complete at 1235. According to the Statement of Facts/Port Log, NOR was accepted by the terminal at 1400 and hoses were connected at 1415. .

13. Discharging commenced at 1515 and was completed at 0545 on the 18th. Hoses were disconnected at 0642. The Pilot boarded at 0830 and the Vessel cleared the berth at 0900 and sailed for Chaguaramas, Trinidad at 0950.

14. The Vessel arrived at Chaguaramas on 21st August 2006 and the Master tendered NOR at 1705. The SOF records that the vessel was awaiting berthing instructions from arrival on the 21st until 1140 on the 23rd when the pilot boarded. She berthed at Angostura Dock at 1325 on the 23rd and tank inspection, sampling and calculations were carried out between 1325 and 1500. Hoses were connected at 1500. Discharge commenced at 1510 and was completed at 0220 on the 24th. An empty tank survey was carried out between 0735 and 0745. Hoses were disconnected at 0745 and the Pilot boarded at 0800. The vessel sailed at 0840.

**The Charterparty Terms**

15. The relevant terms of the recap and pro forma provide:

**QUOTE**

*Vertical Terms*

*Clause 12 – Tendering N.O.R./Laytime Counting*

a) *Notice of Readiness not to be tendered prior to commencement of laycan unless agreed by Charterers. N.O.R. to be tendered by fax/telex to terminal/shippers/receivers and relayed to Charterers are soon as practicable. If N.O.R. is tendered by vessel/master prior to commencement of laycan such notice to only count from 00.01 hrs on first laycan (unless time used) without master/vessel having to re-tender notice.*

7

b) *Even if all laytime expired, charterers shall have 06 hours notice each port unless used. Shifting time from anchorage to berth never t: count as laytime/demurrage time.*

### Clause 17. Laytime delays

a) *Any delays lost waiting to berth at charterers loading or discharging berths shall be pro-rated over all cargoes handled at that berth.*

b) *Any delays in loading or discharging port of this cargo resulting from vessel handling cargoes for the account of other charterers, that prevent shippers/receivers from handling the cargo under this c/p, shall not count as used laytime under this c/p (This clause agreed on Probation for the S.Osprey 89).*

### Asbatankvoy Standard Terms

6. *NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival at berth (i.e. finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside the wharf) whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charter has no control, such delay shall not count as used laytime.*

9. *SAFE BERTHING – SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and proceed therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and of discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more that one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15."*

8

The laytime/demurrage provisions:

     *"LAYTIME:*               *150 MTPH SHINC LOAD / 150 MTPH*
                                          *SHINC DISCH, REVERSIBLE*

     *RATE DISCHARGE:*       *USD 520,000.00 l/sum basis 1 x . for*
                                          *Cartagena and Chaguaramas discharge*

     *DEMURRAGE:*           *USD 11,000pd/pr"*

The cleaning provisions:

    *"18. CLEANING. The Owners shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration quality etc."*

    *19.·    CLEANING CLAUSE*

    *(a)    Charterers shall when possible forward to Owners the general instructions to the load port inspectors/surveyors, in order to assist owners in preparation of vessel's manifold, lines and tanks.*

    *(b)    Prior to loading Owners shall have vessels tanks and cargo system cleaned to Charterers' Inspector Satisfaction at Owners time, risk and expense. Tanks and cargo systems shall be rinsed with fresh water in order to have less than 8 ppm chloride in wall wash. It being noted that Charterers require the cargo to have a maximum Chlorides content of 1 ppm.*

    *(c)    Charterers inspectors/surveyors and Owners are at liberty to inspect, approve and may seal the tanks to be used for Charterers cargo prior to the arrival at the Charterers berth, provided that the surveyors are satisfied that the tank systems can be completely isolated until loading can begin. Such pre-inspection, if carried out shall not deny Charterers nor their inspectors the opportunity to re-inspect the tanks upon berthing at Charterers' berth. Additional survey cost, if any to be for Owners account.*

    *(d)    Upon presentation of the tanks, Owners shall have tanks and cargo system open and dry and odor free, and cleaned to C.I.S. Should any tank/cargo fail laytime to be suspended until such tanks and cargo systems have been re-presented. Rejected tanks to be re-presented within 24 hour. Charterers shall endeavour to commence loading for*

accepted tanks/systems upon surveyors judgment that any remaining tanks/system for approval can be expected to pass upon re-presentation. In the event that due to tanks not being accepted by Charterers Surveyor, any consequential short loading will not be charged as deadfreight. Shippers, Charterers to allow access to shore tank(s) to Owners nominated representative and to provide written confirmation that full nominated quantity is available at time of loading.

(e)    If at any time after berthing, the vessel is idle and ordered off the berth, due solely to the vessels' liability to load cargo as a result of unclean tanks/systems on the vessel, laytime shall be suspended until the vessel is "all fast" alongside again.

**UNQUOTE**

## Notice of Readiness

### Submissions

16.    As the charterparty included a reachable on arrival warranty (clause 9 of the Asbatankvoy form), Owners submitted that Charterers were in breach of this by reason of the fact that berth at Santos was occupied on the vessel's arrival. Furthermore, since clause 17 provides that time lost waiting to berth is to count, Owners' contended that laytime should commence six (6) hours after tendering NOR,. That is 1442 on Friday 21st July.

17.    Charterers disagreed and referred us to the *"Tres Flores" [1973] 2 Lloyds Rep 247*, in which Lord Denning said:

> "In order to be a good Notice of Readiness, the Master must be in a position to say 'I am ready at the moment you want me, wherever that may be...".

18.    Whilst Charterers agreed that the vessel arrived at Santos at 0842 on 21st July 2006, they denied that the notice was validly tendered or sufficient to start time running. They argued that the NOR was not rejected but, simply, that it was not accepted pending inspection of tanks, which they say took

place at the earliest possible time. They justify this reasoning by saying that, after inspection, 11 tanks were rejected: four as having excess chlorides and one with oil residue in the deep well.    The fact that significant further cleaning was required before the vessel was passed by the inspectors being evidence that when the NOR was given, it cannot have been given in good faith, bearing in mind the stringent criteria to which Owners had agreed. They add that it was a condition precedent that Owners would clean the tanks to a standard such that when tested, they would be of an acceptable standard for the agreed cargo and, given that so many of the tanks failed that test, Owners had failed in their contractual obligation.

19.    Charterers further argued that it is the custom of the port to inspect the vessel only once alongside to ensure that there would be no deterioration in the cleanliness of the tanks prior to loading and add that Owners specifically recognised that it was perfectly possible that the inspection would only take place on arrival at the berth.    The premise that the surveyors were bound to attend the vessel immediately she arrived at anchor was entirely wrong. They need only to act with reasonable despatch and in accordance with the ordinary practice of the port. They further argued that by sending a surveyor out on the first working day after the weekend was to act with "reasonable despatch", in circumstances where the ordinary practice was to wait for the vessel to come alongside.

20.    Owners rejected Charterer's argument that the NOR was not given in good faith. Following receipt of Charterers orders, all tanks and cargo systems were cleaned at sea and prior to arrival, which was not disputed by Charterers. They submitted that Charterers admission that the Master himself was not capable of determining, as a matter of fact, the criteria of cleaning to establish whether or not the required standard had been reached defeated any suggestion that the NOR was not tendered in good faith.

21.    Owners also argued that the *"Tres Flores"* had no application to the present case because the relevant provision in that charterparty stated in terms that *"before tendering notice"* the vessel's holds had to be ready to receive cargo,

so that it was clear that the parties had intended the readiness of the holds to receive grain to be a condition precedent, which meant that the NOR could not be validly given until fumigation had been completed. They say that there was no basis upon which the approval of tank cleanliness could be construed as a condition precedent in the present charterparty as clause 6 of the standard Asbatankvoy form does not provide for notice to be tendered after a condition precedent has been fulfilled. The Charterers own clearing clause, clause 19, provides only that the tanks and cargo system are to be clean prior to loading, rather than prior to tendering NOR, and the consequence of the inspection provisions, i.e. sub-clause 19(d), is that laytime is suspended until tanks/cargo systems are represented. Accordingly, since the vessel was already on demurrage at the time of inspection, Owners submitted that the clause applies only to suspend laytime, but not demurrage.

22.   Owners rejected Charterers submission that the inspectors attended on board at the earliest possible time, commenting that leaving the vessel at the anchorage, un-inspected for three days, did not amount to reasonable despatch. They say that there was no reason why the surveyors could not have boarded by launch upon the vessel's arrival rather than waiting until the afternoon of Monday the 24th July. The reality of the matter, say Owners, is that the shipper/terminal refused to acknowledge the NOR for no particular reason. Charterers had been kept advised of the vessels ETA prior to arrival and their leisurely approach in sending a surveyor to the vessel some 3½ days later is probably better understood by reference to a commercial desire to reject the NOR without specifying grounds, waiting until the vessel occupying the berth completed her operations and vacated it, before having to deal with commencement of laytime.

**Findings**

23.   As Charterers do not dispute that Owners kept them aware of the vessel's ETA, it came as no surprise to them that the vessel arrived at the load port on a Friday morning at 0842. Under normal circumstances, Charterers would anticipate that the Master would tender NOR on arrival, in accordance with

e D Case 2:07-cv-08444-LTS on. Document 11 Filed 09/28/2007 Page 17 of 21 n  no

( p. 28, 2007 1:17PM    Lennon, Murphy & Lennon LLC                    No. 1820    P. 31

Clause 5 and on the assumption that the cleaning operations had been satisfactorily carried out, in accordance with the terms of the charterparty. Charterers were also no doubt well aware that the berth, earmarked for loading, was already occupied by another vessel and would not be available prior to Monday 24th July, perhaps later. Although Charterers argued that it was the custom of the port to inspect the vessel's tanks only after berthing, they nevertheless sent the surveyors to the anchorage after the weekend to carry out the inspection and made no effort to explain what steps, if any, were taken to have a surveyor board prior to that time.

24.    It seems to us highly unlikely that such a custom of the port exists, as the most likely consequence of an inspection failure is that the vessel would be returned to the anchorage for further cleaning, with the associated additional costs. Also, despite the availability of numerous published guides to ports, which may well have clarified the position with some certainty, no evidence was place before us in this regard to assist us in our deliberations. We therefore rejected this submission. We also rejected Charterers argument that it is well known in the chemical tanker trade that cleanliness is paramount and that it would be imprudent to carry out the stringent tests required only after the vessel had berthed.    We consider that the prudent Charterer/Receiver would arrange for a tank and cargo systems inspection to be carried out at the earliest opportunity. If the berth had not been occupied on arrival or was just about to be vacated, we consider it highly likely that the surveyors would have arrived alongside in a launch shortly after anchoring ready to board whilst the port authorities cleared the vessel-in and granted her free pratique.

25.    A condition precedent is a term which suspends performance of a contract until fulfilment of the condition. It can therefore have a draconian effect in particular circumstances and the Courts have been reluctant to conclude that a particular term is a condition precedent unless it is clear that the parties have intended it to have this status. Not only did the parties to this charterparty not spell it out that any particular requirement of cleanliness was a condition precedent to the tendering of a valid notice of readiness but there

13

### Findings

31.    Considering that arguments were raised concerning the standard of cleanliness, we found it somewhat surprising that no evidence on the reasons for failure of inspection of the tanks/cargo systems was placed before us, especially since Owners say that they could have demonstrated that unduly stringent parameters were used by the surveyors. In this regard, Owners alleged that the analyses carried out were to 1ppm rather than 8ppm, which they say was the reason for the tanks/cargo systems failure on inspection.

32.    The only evidence we have before us, concerning the inspections is as stated in the Statement of Facts, which in summary record that 11 tanks were reproved on the 25th, 10 on the 27th and one on the 28th July. Laboratory analyses were nevertheless required to establish whether or not the wall wash was within the 8ppm as required by clause 19 and these would certainly be available to the parties. The absence of this evidence serves only to create doubt in our mind and undermines the seriousness of Owners' challenge to the surveyor's determinations.

33.    In the absence of some acceptable evidence on the results of the analyses, we are unable to determine whether or not the inspectors acted in accordance with their instructions, based on the Charterparty terms or exceeded their remit. In the circumstances, we must therefore assume that the standard of inspection and determinations were in accordance with clause 18 Asbatankvoy, and sub-clauses (b) and (d) of Rider Clause19, which is to the surveyors satisfaction. We find therefore that the tanks that were rejected did not meet the required standard and were therefore rejected for cause.

### Other Matters

34.    Charterers also argued that Owners failed to take proper account of the time of completion of loading at Santos which was 1100, not 1430. And, that the 6 hours' notice period at the second discharge port and berthing time at that port had not been taken into account. They further denied that Charterers are

16

be appropriate in our judgement for Owners to enjoy a windfall simply because the vessel was already on demurrage when the inspectors boarded We have therefore allowed Charterers the equivalent of 3 days 20 hours and 10 minutes to compensate them for the additional washing time required, representing the period from 1550 on the 24th when tank inspection began until 1200 on the 28th.

38.   Although tank 4S was again subsequently rejected, we considered that cleaning time allowance should be pro-rated to a certain point as loading could otherwise have commenced in other tanks despite the final fresh water rinse required by 4S, if the vessel had been alongside. We did not therefore deduct the time required for the final cleaning of 4S on the basis that we considered this an equitable method of balancing the allowance given in favour of Charterers.     We therefore allowed Charterers a set-off in compensation for 3.8403 days, which at US $11,000 per day is equivalent to US $42,243.30 gross or US $41,187.21 net of 2.5% net address commission.

39.   Also, we considered two hours for cargo documentation an appropriate allowance.   Since Owners have conceded the load port time after 1300, we further reduced the balance of freight by US $670.31 bringing the net amount due to Owners to $86,023.72.

40.   We allowed Owners the six hours notice period in full at the second discharge port since the vessel was ordered by Charterers to remain at anchor pending payment of freight by the receivers since, effectively, the notice period was used by Charterers.

41.   We also considered that launch and tank inspection costs to be appropriately for Charterers' account since clause 19(c) only attributes additional survey costs to Owners' account for re-inspection costs upon berthing, which these are not.

42.   We awarded Owners compound interest at 7.5% from 15 August 2006 in line with current LMAA practice.

18

43.    Since the Owners have been successful and have recovered a substantial amount, and since we were not informed of any offer which might have had a bearing on the issues as to costs, it was difficult to see why the Owners should not be entitled to their recoverable costs.    However, since the Charterers requested us to reserve all issues as to costs to which Owners raised no objection, we felt bound to do so. Nevertheless, we would wish it to be understood that our intention, if we were to make an Award of Costs in the Owners' favour, would be to award interest from the date of this Award on the substantive issues.

19

IN THE MATTER OF THE ARBITRATION ACT
1996

AND

IN THE MATTER OF AN LMAA ARBITRATION

B E T W E E N:-

FREEPORT MARINE SA

Claimant

(Owners)

-AND-

VERTICAL UK LLP

Respondent

(Charterers)

**MT "Liquid Crystal"**
**C/P dated 05.07.06**

# FINAL AWARD